Hear ye, hear ye, hear ye. The United States Court of Appeals for the Fifth Circuit is now open according to law. God save the United States in this honorable court. Thanks, Pam. Welcome to our virtual Fifth Circuit present your presentations today. Uh, I'm guessing both of you in back in Texas, not having your own, uh, stresses over there, but we do the best we can handling it this way. But we'll see how soon we get back to New Orleans. We just have the one case today. Uh, State of Texas versus United States and a lot of agents thereof. Uh, each of you have probably argued in front of us for the I don't know if I've had that that pleasure. We'll start with the United States. Sarah Harrington, Department of Justice. Thank you, Judge Southwick. May it please the court. Sarah Harrington for the federal defendants. Could I hold hold off just a minute? I'm getting a message on my computer meeting being recorded. I knew something to get rid of it. I think you have to push continue. Yeah, I got it. I don't usually see that. I was something bizarre happened. All right. Sorry. You still have the only lost four seconds. You can return. Okay, I'm okay with that. And I do want to extend my sympathies to you and your families who have been affected by Hurricane Ida. Everybody's okay. Good. So the United States respectfully request that this court enter a stay pending appeal of the district court's aggressive and intrusive injunction. At its core, this is a case about enforcement discretion and non enforcement discretion. And the Constitution affords non enforcement discretion to the executive, particularly in the immigration context. Neither the district court nor the plaintiff states seriously contest that DHS cannot possibly detain every non citizen who is removable or every non citizen, even who falls within section 12 26 C or section 12 31 a two. Is there anything in the affidavits or either from your side or from Texas, Louisiana that would indicate what the numbers are in so far as the effect of these guidelines? I know that, uh, the other side argues that we shouldn't just look at trade offs, but there's been this overwhelming number of potential detentions. Is there any any evidence here about what the guidance does versus not having the guidance? There is some evidence. Thank you for that question, Judge Southwick. So the first is that I sort of have a couple of data points for you. It has been able to deploy 300 additional agents to assist state and local governments with the recent influx of people trying to cross the border at the southwest border. If the district court has its way, or if this plaintiff states have its way, presumably I should have to pull those agents off the border to go after people who have final orders of removal, whether or not they have any criminal history at all. Now, let me just point you a little bit different direction. One of your affidavits, I think, Mr. Berg talks about 200,000 people, uh, detained, stopped something at the border in July. It seems to me what we're talking about in large part, anyway, are, are, uh, detainers, people who either have been arrested by the state, local officials or in ICE custody. Uh, and what's to happen to them when they stop serving whatever sentence? Is there anything on those numbers? Uh, and how this guidance affects releasing as, as judge, uh, district judge said in his opinion, 68 detainer people on detainers are released and that hadn't happened in the previous administration. So the evidence, not those sorts of numbers. Okay, thank you. The evidence on that is not well developed. The, um, the affidavits from the states didn't provide sufficient detail for the United States to verify, um, sort of what was going on with those detainers. But I can tell you just about the types of people who've been arrested. If you look at the six month period between February and July of 2021, there were approximately 24, 26,000 arrests. And of those people, 20% had committed aggravated felonies, had aggravated felony convictions. If you look at the same period from the year before, there were 39,000 arrests, but only 8% of those people had aggravated felony convictions. And in actual numbers, that's about a little more than 2,000 additional people under the priorities with aggravated felony arrests who were arrested. Um, and so, you know, if you have to understand that we're operating against this background where there are not sufficient resources to detain and remove the millions of people who are removable. And so every administration has had to make decisions about how it's going to use its scarce resources. What types of populations of removable non citizens it's going to target for detention and removal under this. Thank you. You have a lot to cover. I want you to leave the numbers and move on. Okay, but but this is I mean, I think this is important ground to talk about enforcement discretion, right? So the states argue that the A. P. A. Creates a presumption of review of judicial review of agency action, and that's true with respect to many types of final agency action. But the opposite presumption applies when you're talking about enforcement and non enforcement discretion decisions. The A. P. A. Says that decisions that are committed to agency discretion by law are not reviewable under the A. P. A. And enforcement and non enforcement discussions are sort of the quintessential type of decision that's committed to agency discretion by law. Again, here we're operating operating in an environment where it is literally impossible to detain and remove everyone who is removable. And so every administration has had to, including this one, make decisions about how it's going to prioritize its scarce resources. Well, Council, one of the things that strikes me about this case, it puts it in the least a different look to it. Perhaps you're saying the effects the same is that, in essence, at least from the state's viewpoint, the federal government has taken what Congress has said are mandatory detentions and removal and identified. I'll just pick a number three of them that actually will be enforced, and the rest were not really going to deal with at this time. It's like announcing, it's the formality of it that's part of the problem, it seems to me. We're announcing that we're going to, I'll use some harsh words that you'll push back on, we're going to ignore what Congress says as to some of these. Take Castle Rock, which you seem to like to some extent, it's as if the police chief of Castle Rock in Colorado says, we're not going to mess with domestic violence, we're going to deal with more serious crime. So before you're arresting me for domestic violence, come to me, we've got to talk about it, even if you encounter them out on the street. What do you say to that? I'm off base. Well, so first, the priorities don't prohibit the detention or removable of people who fall presumptively outside the categories. So it's not as if we're saying we're going to refuse to enforce other provisions of law. But I think it's fair to say that it's very hard for an agent to be authorized to, you've got to get approval, pre approval if you know about these folks, and if you encounter them outside, that you're not, it seems to be entitled to detain them, unless you have this pre approval. So I think there's no evidence that that's a difficult process. I think, you know, once you keep moving. All right, well, you mentioned Castle Rock, and there Justice Scalia, we do like that case, because he explained that when a statute uses the word shall when it's talking about enforcement, it doesn't, it's not mandatory that there's this background principle of enforcement discretion. And more recent cases from the Supreme Court, including Arizona, United States versus Arizona, confirms that that discretion enforcement discretion is particularly potent in the immigration context. And so I have a question about the scope of your argument. I understand the main thrust of your argument is that, well, these statutes are directed at detention, so they don't require the government to initiate removal proceedings that's within the government's discretion who to initiate removal proceedings against. But what's the government's position on when you do initiate a removal proceeding for someone who falls within 1226 C, then do you think you have discretion on detention or is detention then mandatory? So the way DHS operates is that once they initiate removal proceedings and decide to make an arrest of someone under 1226 C, then they do detain that person. Now, I don't want to commit that it's true for every single person. There's a lot of moving pieces, but that is the operational sort of instructions that they operate under. So there are not people who are in removal proceedings who fall within 1226 C who under this guidance or these memos are are out on the street. So again, I don't want to say there's nobody because mistakes happen, but that is not sort of the structure of the policy, though it's not right. That's not the structure of the of the priorities. Your position is this just has to do with the discretion is relates to when the government has to initiate the removal proceeding in the first place, right? And again, you know, I think the sort of statutory scheme acknowledges that Congress expects the executive to make large scale discretionary decisions about how it's going to allocate its resources about which categories of removable non citizens it's going to focus on because there are millions of them and Congress has never come close to appropriating sufficient funds to actually detain and remove all those people. And, you know, Texas conspicuously ignore section 12 25 in Louisiana, but that's a provision that mandates detention of people who are crossing the border. And one of the priorities here is maintaining border security. Judge Page, you put your about to ask a question. I'm sorry. Well, I have a concern, and perhaps I shouldn't since nobody else has talked about it, but I have a concern about the status quo. I mean, I think the posture of this case is one where the district court has issued a preliminary injunctions, which suggests to me that that the states will be pursuing some permanent injunctions. Is that right? As far as that's my understanding. Now, there will be new priorities that come out at the end of the month, so that's gonna change the policy and procedure. Correct. And presumably, Texas will challenge those. Well, it's so I guess my concern is with regard to status quo. The preliminary injunction entered by the district court upset the status quo to the extent that when I heard you talk about the numbers six months from 2020 versus six months in 2021 and the difference in the numbers. So obviously the status quo is one where now the new policy is being applied. That's what's been happening. And so the district courts stay of the preliminary. The upsets the status quo. Yes. Should I be concerned about maintaining the status quo pending some final resolution? Because here this is this would be a stay pending a decision by merits panel on the merits of the appeal. Right. And below you have a preliminary injunction, which precedes a permanent injunction. So nothing's finished any place. That's right. So the status quo is, though, that the current policy is being applied. And so what I'm asking you is whether or not there is some law that favors maintaining the status quo until you get some merits, some final review on the merits of this. I mean, I think that's generally what preliminary injunctive relief is meant to do is it's about what status quo you're supposed to look at in this kind of a situation. Our view is that you should, you know, we appreciate the administrative say that this panel entered. We would like that to be a stay pending appeal. If we prevail on appeal, we hope that the case would be dismissed because we think the plaintiffs don't have standing. We think these actions are not reviewable, and so their complaints should be dismissed. But also, you know, there's also the balance of equities. And as I've explained, having the priorities in place, which again focused on public safety, border security and national security, having those in place versus having no priorities at all has resulted in the arrest of 2000 more than 2000 additional people with aggravated felony convictions in that six month period. And so Texas and Louisiana complain that they're afraid that crime is going to go up with the priorities in place. But in fact, all the evidence points in the opposite direction. And in the meantime, we're also securing the border and trying to prevent an influx of people. If we really have to focus our energy on detaining and removing everyone who's 1226 C and 1231 A2, we're gonna have to pull agents off the border in the Rio Grande Valley and El Paso. Texas hasn't really spoken to that, but I imagine that's not what they want to happen. But that would be the inevitable. Let me ask you about that. It seems to me that there's a reality here that the evidence seems to support the evidence is preliminary stage, and we're not talking about everybody being detained. This is categories, but we're talking about is it's not an affirmative injunction. It's one of the that the judge made clear is saying that you cannot be following these, uh, formal guidance that has been promulgated. So it seems to me one of my questions on irreparable injury. The extent you argue we're gonna have to move all our assets around and start detaining everybody subject 1226 1231. I don't think that's reality. You're still gonna be subject to the numbers that numbers problem that you that you've addressed. So tell me what is a fair assessment of the difference between the world with this day that, uh, that you want of the plenary injunction and the world without the stay. So the world, it's true that the district court clarified in response to our request for a stay that that we have not been ordered to detain or remove any particular people. But it is very clear that the injunction prevents us, as you say, from using the priorities. And so we would have to operate in an environment where there are no priorities. Well, there are no formal priorities from Ohio, but I would imagine out there on the border and other places where this would have effect. There are some sort of prioritization going on now. Well, I mean, there is not because the priorities are in place. I guess I would say two things to that. First, the logic of the district court's decision is that if we do adopt new prioritize detaining and removing everyone in 12 26 C and 12 31 12 a two before we could before we could go after anybody else. That is the logic of the district court's decision. But second, having kind of informal secret priorities at the lower level isn't the kind of thing that should you know that's not really in service of good government. And we're talking about irreparable injury. I'm not talking about what the outcome of this case is irreparable injury that we need to find in order, uh, to stop the preliminary injunction long term, right? So it's a I mean, it's a threat to public safety. If you look at if you think go back to the numbers that you asked about that I talked about the six month period from this year to last year, the priority scheme that was in place a year ago basically prioritized everyone, which is sort of similar to an environment you would be operating in with no priority scheme. And that system, compared to what we have now meant 2000 fewer people on a six month period with aggravated felony convictions who were arrested. And so to the extent we have evidence of the actual effects on public safety, I think that's a serious that serious evidence that it is helping public safety. We also again have more people at the border trying to stem the flow of people coming across the border, which has increased rapidly in the last year or two. Um, and all of that, you know, in order to the benefit of plaintiffs like, you know, Texas and Louisiana. Let me ask you about this. We just have this one argument today. I think we may have a little extra time because we need it. What are the possibility of staying the injunction, but just outside of Texas, Louisiana to make it a limited injunction? In other words, uh, to Texas and Louisiana, but have it have no effect outside. And so we would not, uh, so stay the nationwide effect of it. That would be preferable to a nationwide injunction. I don't want to try to talk you out of that, but I think staying the injunction altogether is preferable to that for some of the reasons I've given. I mean, making the DAPA case, certainly maybe a lot of cases and a lot of Texas versus we Anthony Texas versus United States case, the 2015 Jerry Smith opinion that did talk about nationwide and array for nationwide injunctions. In that case, is this distinguishable? Well, I mean, I think it's, you know, that's a hard case for us. I'm going to be honest about that. And, um, you know, we generally think the nationwide injunctions are not appropriate. We understand this court's precedent, saying that they might be more appropriate in the immigration context than not. Um, you know, here, where we're not being enjoying to do anything affirmative, maybe that's a context in which you could just have a limited injunction to Texas and Louisiana. But again, I think that staying not staying the injunction, having injunction in place is more likely to create the kind of harms that Texas and Louisiana are pointing to because it would prevent the agencies from really focusing on public safety, border security and national security. And it's that focus that's gonna well, the DAPA case certainly says that, especially in the immigration context, a nationwide injunction may be appropriate. Um, but, you know, the district court here expressed a lot of doubt about the propriety of nationwide injunctions generally. But then he seemed to think that, as I read it, that the DAPA case required him to impose one here, whereas injunctions and especially their scope are always a matter of equitable discretion. Um, so I wonder if, um, I mean, you read the DAPA case of saying you have to once there's a violation, impose a nationwide injunction or in immigration cases or just the courts have that discretion. Oh, just the latter. Thank you, Judge Costa for that question. I think the DAPA case suggests that courts have the discretion to do that if they want to, and that maybe that discretion is in a different type of case, but it's certainly not mandatory. Speaking of the nationwide injunctions, and I know we're over. Is it okay to ask a few questions? Judge Southwood? Uh, we have extra time today. I think on the nationwide injunction issue, I saw that similar cases to this one were brought in Arizona and Florida. Both were dismissed, and they're now being appealed by the states in those cases. Are there any other pending cases out there challenging this enforcement policy? Oh, that's a great question. I think there may be one more, but I can if the court wants, I can get back to you in rebuttal about that. I'll ask my team, but it's not coming to me right now. But as you suggest, those two cases were dismissed. Arizona and Montana, who are co plaintiffs, asked for an injunction pending appeal that was denied recently by the Ninth Circuit. Um, so, you know, we think the proper disposition of this case is also that the case should be dismissed because the priorities are not reviewable and because the seats have no standing. One final question. I know you the government's brief talks about other administrations have had enforcement priorities, similar memos. Um, can you just talk a little bit about those and, um, and what classes they prioritized or didn't prioritize classes of immigrants? Sure. So the, um, the last administration, the Trump administration, their priorities basically said that they're going to prioritize everyone who's removable. Um, and so, you know, query whether that's very different from having no priorities. You know, I mean, I think they meant it. They wanted to go after everybody, but they didn't sort of put certain categories above other categories. Um, in the Obama administration, there were various different iterations of priorities memos. They targeted similar categories to what what this administration is targeting. They're trying to go after public safety, national security and border security. Um, and so, uh, you know, there's sort of some differences at the margins, but those are basically the same types of priorities that we are pursuing here. And again, I think it's inherent in the system that there has to be some sort of prioritization given the lack of sufficient funds or physical or personnel capacity to actually detain and remove everybody who's removable. Any other questions, gentlemen? All right, Mr Wilson. I don't think you need to be worried about your time. You will hear from you. Thank you very much, Your Honor. Um, may I please the court? I'd like to begin with the statutes that issue here. Um, 12 26 C and 12 31 a two. Um, I'd like to begin there because I think both the text, the text of the statute, the structure of the statutes, um, and also the way the Supreme Court has interpreted these statutes required to show that they're mandatory. Um, first, the statues, but say, shall the Supreme Court has usually canoes a mandatory requirement. Um, second, to talk about the structure of the statutes. Um, if if shall doesn't mean must in 12 26 C. Um, the structure of the statute really doesn't make any sense. We've got 12 20 12 26 a which says made the, um, the attorney general now DHS may detain people. Um, 12 26 C. Mr Wilson, why doesn't all these differences you're you're making, which I understand there's they make sense based on the text and structure. But why doesn't that just go to whether someone has to be detained once they're in a removal proceeding? So someone who's within who fits 12 26 C has to be detained. It's mandatory someone in some of the other sections. It's discretionary whether they're actually detained once the removal proceeding is initiated. But why does that require the initiation of the removal proceeding as opposed to determining their detention status once they're in a removal proceeding? Your Honor, 12 12 26 a specifically speaks to, um, made may detain pending that determination. Um, I think 12 I think 12 26 C should be read exactly the same way. Um, it and and in any event, your honor, uh, as Judge Southwood noted, as the district court made extremely clear, um, this this injunction doesn't require the district court or excuse me, the United States to, uh, detained, detained or removed or or institute removal proceedings against anyone. What it says is that the memoranda issuance in this case are contrary to law or arbitrary and capricious or procedurally invalid. It's like I'm trying to understand the state's position. I mean, take someone, um, someone who's released from a state prison or county jail who has a drug conviction, um, does not fall within the enforcement priorities in the memo. Is it? I thought it's the state's position that the federal government must institute removal proceedings against that alien who has a drug conviction and then obviously must detain him. Is that not your position? You're all right. I think we certainly asked for the district court to enter an affirmative injunction. The district was very clear. It wasn't. Um, but the district court was very clear that it was doing was enjoining these specific memoranda. Um, you know, to sort of talk about some of the folks who have been who have been released here. And we've got, you know, people who under, I think, any reasonable definition of public safety with these serious threats to public safety. Um, people who have been arrested with more than £50 of marijuana, people, a person in sex offender. We're not. We're not saying here on appeal that the United States has to institute removal proceedings against anyone. What we're saying is that the district court correctly determined that the memoranda violated the A. P. A. In several respects, I guess I'm trying to figure out what the practical meaning of all this is then, because the government says it agrees that once it brings a removal proceeding against someone who these people who have serious drug convictions in the past that it does have to detain them. So and you're saying, well, we're not requiring them to start removal proceedings. That's still within their discretion that they've always had. So I guess I'm I don't know. It seems kind of academic if this that's the distinction. Well, to two points runner. First, I think that's what the district court said when it issued its negative injunction. Um, second, I I just I just don't think we have. I just don't think it's in this case as to whether the United States is required or not required to institute removal proceedings. Um, you know, that would be that what we have here is an A. P. A. Challenge to the Miranda. I think it would be a very different case if what we if what we showed up and said was, you know, the government must detain must institute removal proceedings against certain individuals. But I thought that's the whole linchpin of Judge Tipton's order. Because on this issue of whether this is committed to agency discretion, the feds air saying who we bring removal proceedings against is committed to agency discretion. And our memo says these are the three categories we prioritize. And Judge Tipton says, Well, no, there's no there's no enforcement discretion on this because these statutes are mandatory. So it seems to me the argument for you has to be not that they're not just about detention, but the statutes are also guide the X or limit the exercise of discretion and who is being pursued and removal proceedings in the first place. Um, no, no, Your Honor, I don't think that's right. Um, the statute speak very clearly to who must be detained. And again, 12 26 a, um, talks about detaining pursuant to making that decision. Um, so we we think under under 12 31 a two and 12 26 C, the government does not have any discretion not to not to detain. Um, what they what they do after that, Your Honor, I think would be it would be a separate case. That's not I don't I don't think we really we really briefed that in detail. We didn't bring claims to that regard. Mr Wilson, let me ask you where that Texas Supreme Court is has told us recently that people cannot be held in pre removal detention indefinitely. It seems to me your argument is suggesting everyone has to be detained subject to this subject to the mandatory language and therefore legally they must be processed for removal. It's not really discretionary at that point. People at least they have to be released from detention if it if it becomes unduly prolonged six months as a rule of thumb. Any reaction to that? Um, you know, Your Honor, it's it's certainly it's certainly right that other Supreme Court precedent may sort of downstream require other actions. Um, again, I, um, don't think that the requirement to detains what or excuse me, the requirement to remove is what's what's really going on in this case. Um, and in any in any event, Your Honor, I would I would also say that past sort of determining that this was contrary to or the memorandum were contrary to law. The district court also determined that they were arbitrary, capricious and procedurally valid. And one of the one of the hallmarks of the review under the Chenery principle is we evaluate what the agency did for the reasons the agency gave. So, um, there there's certainly there's certainly other. The district court made other holdings that I don't think really turn on sort of this this distinction in any event. Mr Wilson, you referred to this as a negative injunction. But on page 1 58 of the district court's opinion in order, there were four different items where the court, the district court said to ensure compliance with this preliminary injunction, the court further orders the following. Then there were four things which it orders the government to do. I understand there has been some, I guess, explanation of what what that means. But it sounds to me like that's a firm. You gotta take some affirmative steps, which which sounds to me like a positive injunction. So does the government have to do those things now or not? Your Honor, I would refer the court to the hearing on the stay in the district court and the argument there and also the orders that the that the district court judge subsequently issued. Um, he made very clear in that hearing that he thought, um, that that those were sort of sort of discovery, discovery related issues. He expected that the government had that information. Um, and the district, the district court judge, uh, well, the government to do. My only question is, are you? Is the government still required to do that under the terms of this order? You're referring me to a hearing. I appreciate that. Tell me what he did. Um, what the what the what the district court did, and it's either E. C. F. 90 or 92. Um, what the district court did is push those dates off, said he thought that that was information the government would have. And then also said the answer is, but I don't know why you don't want to answer me. It sounds like the answer is the government is required to do it under the terms of his original opinion and or is that right? I think under the terms of the preliminary injunction on its face, that's correct. I think, um, in E. C. F. 90 and 92, the district court made clear that if the government thought this was particularly burdensome with the government couldn't comply with this, he was perfectly happy to talk to him about about what? So he's conducting discovery. Is that what he's doing? But part of your honor, I'm sorry. The judge is conducting the discovery for the parties. You said no, you're right. Every matter. I think that the I think that the district court did refer to it as a case management tool, um, and said he was perfectly open to discussing this with the United States at at further proceedings. If it was particularly burdensome with troublesome. All right. Let me ask you, Mr Wilson, about your concerns with the language of the guidelines with the memos. I think there's been acknowledgement. I'm not holding you to it. If you tell me otherwise that that there has been in the past, uh, needs if not to limit, um, by ice and other enforcement officials, the number of people who can be detained regardless of this language. Um, you can tell me if that's right or wrong, but it seems to me if that's right, the real argument here is the formality of this memo. That is, it's an announcement, almost an affront to Congress. And here are your make up a new number. Here are your 10 categories of people who must be detained, and we're announcing only five of them or four of them or three of them are our priorities to us. Um, some of the others will may snatch up from time to time. Is that really an unfair way to look at this argument? I'm not saying it fails for that reason. But is the problem really here that it's formal national guidance that in a way undermines the mandatory nature of what Congress said? Um, Your Honor, a couple of responses. First, I don't think that's quite right. I mean, the United States is certainly asserted in their briefing that there's there's no way they can detain everyone and everyone has. You're fading out just a bit, Mr Wilson. I don't know if I T people can take care of that or whether you're in my apologies. Your Honor, I'll try to speak up. I need to speak up, too, probably. But go ahead. So I was gonna make a couple of points on her. First, they've certainly sort of asserted that everyone has to have priorities, and there were past priorities. That's that's not something they put before the district court if they want to make sort of an argument. So the district court took took took evidence. They were. They could introduce whatever evidence they wanted. The district court then took approximately three months, writing a extremely thorough 160 page opinion. Um, I think the first time any of this came into the case, um, or at least what they're relying on the Court of Appeals was evidence they put in after after the preliminary injunction for purposes of the stay. So what I would say, Your Honor, is if they want to sort of make an argument related to congressional acquiescence or, you know, literal impossibility or something like that, they can certainly put that evidence in front of the district court in further proceedings. But I just don't think it's there right now. Um, second, Your Honor, we know from the home and declaration that we heard in response to some of this that for various reasons, the United States has has decreased its detention capacity. Um, they certainly have in both the as the home and declaration says in both the Trump and the Obama administration's ice reprogrammed money. ISIS canceled sort of contracts that they had with third parties to detain certain aliens. Um, and that has had the Um, as the home and declaration says in 2019, I said, um, an average of over 50,000 people detained today and highs around 56,000 a day. And now they're saying something like 26. Um, so at a at a bare minimum, Your Honor, whatever, whatever, whatever sort of priorities they have to or having to come up with, they decreased on purpose. They're changing fast. So I don't It's certainly a problem, Your Honor, that they have, um, that they have sort of flouted the priorities that Congress gave put in put into law. And it's also a problem if if I'd refer the court to the opinion in more begin, um, where the Supreme Court recognizes that Congress was was writing 12 26 C and 12 31 and two precisely to get at this problem, right? Um, Congress recognized in the old I. N. S. Which was responsible for this at the time was was not detaining and not removing criminal aliens and that that had various negative consequences in part because of the extremely high recidivism rate, um, which Congress found at the time was in the seventies, um, and which evidence out of Tarrant County shows or at least Tarrant County in Texas is also in the seventies in this case. Um, so so it's certainly a problem that they're that they're that they're ignoring Congress's expressed instruction. It's further Castle Rock in Castle Rock. The law was passed because there was evidence that law enforcement wasn't taking protective orders seriously enough. So how do you get around Castle Rock and Justice Scalia's, um, point that there's a long tradition of mandatory arrest statutes that don't eliminate this enforcement discretion? Oh, sure, sure, Your Honor. Several ways. And first, first, Castle Rock is is written against that backdrop. I mean, the court block quotes the sort of backdrop of enforcement discretion. Here is the more tells us Congress was was explicitly trying to remove, um, that discretion in in for these categories of aliens. Um, second, Your Honor, Castle Rock comes back to the point, several times that well, what's the what are the what are the police there to do if they don't know where the person is or, um, can't find them or something like that? That's that's not the case we have here, as demonstrated by the declaration we have from TBCJ, which shows that ice is again affirmatively rescinding detainers and affirmatively rescinding detainers for some subset of some subset of people who were, you know, pretty serious criminals. So it seems going back to our earlier conversation, the state's position, and this is what I understood the state's position to be, is that statutes like 12 26 C do dictate that removal proceedings themselves have to be commenced, not just that people in those removal proceedings have to be detained. Is that I'm still a little confused on what what you know? No, Your Honor, I don't I don't think that's what I don't think that's what the preliminary injunction we're up on requires. I also don't don't that it would just be 12 26 C doesn't eliminate the government's discretion about who it wants to put in removal proceedings. Then why is the memo problematic? I thought the whole basis for the district court finding the memo to be contrary to law, etcetera, is that it it says the government has discretion and who it brings enforcement proceedings against. But you're saying 12 26 C doesn't dictate that it brings enforcement proceedings against everyone. Your Honor, I'm saying that 12 26 C, uh, does what it says, which is required that certain categories of criminal aliens be detained. And does that also mean they have to be? You have to bring removal proceedings against that work in the or or again, does it just say you have to be detained once that removal proceeding is initiated on the government's behalf? You know, Your Honor, we're certainly aware that when it comes to when it comes to instituting removal proceedings, the government has, you know, various various levels of discretion. I would I would submit that for for these particular categories of criminal aliens, Congress certainly required that they be detained again. I think 12 26 C says that 12 26 A at least very strongly suggests that the detention decision is upstream of the removal decision. Um, where 12 26 A says that, um, aliens may be detained pending that decision. Um, again, Your Honor, I just I see you're saying they have to be detained even if there are. It's a separate issue. Even if the government doesn't want to remove him, they have to detain him. Is that your position? Your Honor, I think that's I think the statute certainly says that they must be detained. You can't detain someone without a removal proceeding. You can't just detain them without any immigration proceeding, right? Um, Your Honor, there there might be. There might be lots of things downstream of that decision. Um, but I think what the statute says that they must be detained. I mean, one of the things you're extremely clear time is that the injunction itself at this stage doesn't require invited being removed. It does seem to me your analysis doesn't require us to think in those terms because that's the support. But it is or is not the support for the release that you have gotten so far. Um, let me ask you, there seems to be part of your argument on the limits on discretion. Uh, that's relevant here. It's very evidence based. Uh, you have these dueling affidavits to some extent, Mr Berg and Holman or whatever it is, Mr Holman. It seems to me that if the reality is, and I don't think we know what the reality is, that there are four or more people subject to these statutes, mandatory detention, then there's the ability for the U. S. Government, uh, to detain. And if that is the reality, you have also on top of that this enormous number of people at the border who may not be subject to the statute in the first place, but also have to be dealt with. Isn't that part of what's going on here? And do we have enough evidence to really say that there's a necessity for prioritization? The formality of it is not really the problem, though it does. In a way, I'll say it's a little bit unattractive. The federal government executive branch is saying we're not gonna follow Congress on some of what it's saying. But if that's the reality that you have this numbers disconnect between the people subject to mandatory detention and the ability of the federal government to do it, there has to be some sort of prioritization. Um, a few points, Your Honor. First, the evidence in the record really clearly shows that, and this is from the Holman Declaration, that they have purposely decreased their detention capacity. Second, again, that means they could do more. They may not be able to do everything that Congress is saying is mandatory, but they could do more. Is that basically what that much would support? Um, they certainly could do more again. To be clear on. I don't think the primary injunction here requires that. And I'd like to point quickly again to, uh, the district court's opinion isn't just based on the idea that this is this is contrary to law. The injunction that the district court issued in the opinion of the company also said that, um, also said that the memoranda issued were arbitrary, capricious and procedural and valid because they didn't go through notice and comment. Um, and it's certainly true in a P. A. Proceedings are even even if even if the government can do something, it can't do it. Arbitrary and capriciously or in a procedurally invalid way. I mean, this this comes from, you know, dozens of dozens of cases, including Supreme Court cases. Regents is the first one that comes to mind where, uh, the court says, you know, perhaps this is in the power of the government to do what they didn't do it in the right way. So that that those issues A. P. A. Procedural requirements like notice and comment only come to us if if it's not committed to agency discretion as as an enforcement matter. Um, let me I have one last question. Is there a Supreme Court case you can cite that has ordered law enforcement, both criminal and immigration? I'm talking about, um, to institute proceedings against an individual or a class of individuals. Um, what I would say, Your Honor, is that the Supreme Court has repeatedly described, uh, 12.6 C and 12 31 82 is mandatory. Um, those air those air in a slightly different context. In all those cases, the plaintiffs were the detainees were bringing the challenge, and they were already in immigration proceedings. Right. In all those cases, Jennings Guzman, who's one shop is pre app. The more, um, it's certainly true that those cases rose in a posture, Your Honor. What? What I would say is that, uh, the the Supreme Court has said these provisions are mandatory in all of those cases. And as recently as the Guzman Chavez case, the United States appeared to agree is the district court noted in somewhere around 68 of its opinion, citing the solicitor general's briefs in that case. But so directly on my question, you know, I'm talking state federal criminal immigration. Is there a Supreme Court case that has ordered the government to bring Institute proceedings that the government, um, hadn't already brought in the posture of the case? Um, I'm not aware. I'm not aware of that, Your Honor. I wouldn't say that there that there I would hesitate to say that there are none. I'm certainly not aware of it. What I would say is that that's not what the dish that is expressly what the district court said. Its injunction is not requiring one last run at this, and I'm sorry, Mr Wilson, you've given your best to one of the things in the DAPA case, uh, and it's Judge King and her dissent that quotes it, but it's from, uh, the plaintiff Texas brief in the briefing on appeal. Plains refute the mistaken premise that this lawsuit challenges DHS DHS decision not to remove certain unauthorized aliens, making clear that this lawsuit obviously just that one has never challenged any decision by executive to initiate a forego removal. It seems to me that we can't disconnect mandatory detention from what happens thereafter. They're gonna be detained. They can't just be housed for the rest of their lives. They have to be subject to mandatory removal. Proceedings are released after some period of time. Um, well, obviously, we're looking at a stay of a preliminary injunction here, and I'm looking at the overall merits. Can we really ignore that, though, in what you're seeking is an end to the kind of guided discretion, uh, in these memos on who is to be detained? That necessarily means those people have to be subject to removal. I'm it could your honor. I don't I don't think it necessary. I don't think it necessarily does. I mean, again, the government may exercise its discretion downstream in various ways to release. I mean, ultimately, they decided not to bring removal. They have to release them. So they exercise on discretion just a little later. Um, that would that would ultimately that would ultimately probably be true, your honor. I mean, I'd like to offer a couple of points. Um, first, we think that we think that these statutes are not discretionary. And second, as I mentioned to Judge Costa, um, there there are also, um, arbitrary capricious claims and, uh, claims related to procedural invalidity in this case. So what I would say is even even even if the even if the court were to conclude that these priorities were viable under some set of circumstances, we think that for the reasons the district court identified their arbitrary and capricious and procedurally invalid in this circumstance. All right, if these statutes are so clear and being mandatory, um, why didn't Texas challenge the portions of the memo in the DAPA case that had similar enforcement priorities? I'm looking at Judge Smith's opinion. It says part of DAPA involves the secretary's decision not to enforce the immigration laws as to a class of what he deems to be low priority aliens. But importantly, the states have not challenged those priority levels. And then it was just the DAPA grant of DAPA. Um, you know, you're I think I don't remember the precise that I don't recall the precise statutes of issue there. Um, what I would say is that DAPA DAPA was a very different case that was conferring status on, um, I hundreds of thousands of individuals solely in Texas. Um, and, you know, it's certainly true that sometimes, your honor, you may you may pick the big in front of you rather than rather than picking rather than picking every possible thing you can reclaim on. I I certainly wasn't in this office at the time. And it's like I'm not sure I could speak to our litigation strategy even if it weren't privileged. One thing I didn't ask you, but I did ask your friend on the other screen. Um, the nationwide injunction aspect of this. Uh, does this really fit what was said in the DAPA case? Uh, is there? If you start from the proposition, which maybe you don't, the nationwide injunction should be by far the exception. Isn't this distinguishable from DAPA? Not that that means it would not be a nationwide injunction here. Just how do you defend a nationwide injunction? Sure, your honor. I mean, I think I think what the DAPA case says is that when it comes to immigration law, Congress and the courts have repeatedly said there should be uniform uniform application of the immigration laws. I think also some of the some of the same some of the same issues are at play here is in the DAPA case. I mean, once people once individuals are released, they may be free to move against the states. Um, freedom of among the states. That is really more of a problem for DAPA than it would be here. It seems to be moving around to take advantage of DAPA and the opportunities for people otherwise removable. It was much more significant, uh, motivation than it would be here. And here is a matter of, uh, well, anyway, isn't that a distinction? Um, your honor, I think there were probably I think there were probably more individuals, um, at issue in DAPA. Maybe the cost would have been different. But under the under the theory of the theory of harm that we have, it's it's certainly certainly it seems likely to me that people might move between states and then, you know, recidivate recidivate in Texas or create costs or create medical costs or something like that for the state of Texas. As we as we, um, argue before the district court. All right. Thank you. You have time for rebuttal, Miss Harrington. Thank you so much. I'd like to start first. Judge Costa, you asked about the fourth case out there, and I'm sorry I'd forgotten the name. It's called. It's in the southern district of Texas called Co versus Biden, a suit brought by a sheriff and an organization that purports to represent ice employees. And there's no injunction yet in that case. Um, are you saying that's answer his question? That's the only other case? Yeah. Other than the ninth circuit in the 11th Circuit cases that he identified in Florida and Arizona Montana case. I just have a few points I'd like to make on rebuttal if I can. Mr Wilson says that the memo at the case basically has nothing to do with constraining the agency's discretion about initiating enforcement proceedings. Removal proceedings. Excuse me. But in fact, the memo does direct priority, you know, sort of the exercise of discretion towards the priority groups with respect to initiating removal proceedings. So excuse me. While the memo is enjoined, it does sort of constrain the agency's discretion about how to direct those efforts. I also want to emphasize the number of places there. Where are you talking about? Is this the February memo? Yes. And where are you saying there's this enforcement just a weekly? Well, that's weekly reporting. So if you look at page 1 70 of the addendum to our stay motion, okay, it talks about all the different decisions that are affected by the memos. Okay. Um, so I just want to emphasize the number of different places in these removal proceeding sort of in the chain of events that happen where there is enforcement discretion. There's discretion about whether to initiate enforcement proceedings by issuing a notice to appear. There's then discretion about whether to make an arrest. The generally when a notice to appear is issued, there hasn't been a determination made about whether someone falls within section 12 26 C because under the, you know, the categorical approach and the modified categorical approach, it's not an easy determination to make. Always. And sometimes there are facts that are unknowable before you have someone because 12 26 C, for example, covers people who've ever been addicted to drugs since entering the country. That's not something that the agencies would necessarily know about. So once they initiate removal proceedings, there's discussion about whether to make an arrest. Then there's discussion about, um, you know, all along the way, the Supreme Court emphasized in Reno versus A. A. Um, I'm thinking of 80 A. A. D. C. Um, that at any point along the way, the agency has a great discussion about whether to abandon the course of attempting to remove someone. And so the memo that's been enjoined directs discretion and prioritization with respect to all of those decisions, and that's a serious harm that's being inflicted on the government while that's enjoined because they can't prioritize public safety, national security and border security. I just want to point out that the states have no answer to heckler versus Cheney Chicago versus Morales and Castle Rock versus Gonzalez. Mr Wilson says, Well, there Congress was trying that in Castle Rock Congress, excuse me, the state legislature was acting against the background of nonenforcement. But here Congress is trying to constrain that discretion. But the only thing he can point to is the use of the word shall, which was also used in the statute at issue in Castle Rock. So that's just he also has some evidence from the congressional background. Extent that's relevant. There's different opinion on that. This was an effort to require INS to tighten up and to be more aggressive and and and attention and removal. Isn't that part of the backstory for the new language? So I mean, Congress has in many ways expanded the class of people who are subject to removal. And in many of those provisions, it uses the word shall also in Section 12 25. It uses the word shall about removing people who are attempting to cross the border. Okay, you may be getting to my only point is it seems to me there is something that Mr Wilson has, and the briefing does have that Congress was concerned about not being aggressive enough and removing people. And they were. And so this legislation was shall was intended to stop that. But I make it 100%. So I mean, that's all I'm asking. I'm not saying wins the case for it. But isn't that in the legislative backstory? So I mean, two things as Judge Costa points out, that was also true in Castle Rock, and that wasn't enough. Just using the word shall Congress operate? You know, let's just say yes. Yes, that is part of the legislative history. That is part of the legislative history. But I'm saying that's not enough to signal that Congress wanted to start with. Yes. And then yes, but I apologize. That's not enough to overcome this background presumption of non reviewability of enforcement discretion decisions. I mean, the larger context is that Congress has never come close to appropriating enough money to enforce all of these shall provisions. And Mr Wilson keeps saying that we intentionally reduced our bed capacity. We don't. We don't agree with that. Many contractors have canceled their contracts. There's a pandemic that reduces our capacity. But even if overnight we could magically quintuple our bed space, which we can't do, but even if we could, we would still be orders of magnitude away from the number of being able to house the number of people who are covered by 12 31 a two and 12 26 C. Congress. What is the necessary predicate? I'm sorry, Greg, for the discretion that you're talking about. Obviously, responded to the evidence Mr Wilson had from the home and affidavit. But if, in fact, there was evidence of point some point not here yet that eyes could do more. And part of the effect of these priorities is this sort of an announcement somewhere within the administration that some of these people should not be detained. Not announcement. It's driven by that, which would probably never come out in evidence. Isn't a necessary predicate for this? Is that DHS ice? Whoever can't do more than it's doing as opposed to it wants to pull back from removing certain kinds of people who they could remove. Um, it is the evidence you're talking about essential to your argument that DHS cannot do more. Well, what I would say is the point of the priorities is not that ice and DHS should do less. It's a question of with what they have. Where should they direct their energies? Okay, and so on. And we've seen the results. 2000 more people in a six month period with aggravated felony convictions were removed with the priorities in place than without the priorities in place. Okay, so it's about targeting what we view as the greatest threats to our country, to the border, to the national security into public safety. I just if I can take one second and address the reporting requirements that Judge Graves asked about. It's true that the district court said in response to the a motion that those were not part of the injunction. But it's also true, as you suggest, that they do seem like discovery orders, which the judge cannot order. That's something that, you know, without the request of a party, at least. And so we're not aware of any authority that the district court has to order the government to comply with these sort of reporting requirements. And so we would ask that those be stayed as part of the of any stay of the injunction. What is it? Go ahead, Judge Costa. There's just a quick question. You mentioned at the I think way back in the spring, they said it was coming soon. Now I hear the end of September. What? I know these things. You're not in control of them. But really, what? What is the best you know about when that new guidance is coming? It's end of September. My agency friends understand that is not a deadline we can blow. I'm sure you understand there's been a lot going on with Afghanistan and other things going on at the border and the pandemic situation that has created more work. I'm not giving excuses just as an explanation. That's why it's taking longer than we've expected. But end of priorities out, I think it's a February memo said 90 days you would remember better. So anyway, these things slide. Yes. No, I've emphasized with my friends that this is a firm deadline. So, uh, question I have about that the initial order of follow up order, I forget which said that if if the injunction stays on the predicate of the injunction stays in place that by what indicate exactly how they would be making these enforcement decisions that's been postponed until October, I suppose. But that still is a requirement to how you would how you be making these decisions. Right. The judge ordered us to tell him like sort of what basically what priorities we would use, what legal rules we think would apply. There will be new priorities, the final priorities before October. So I think that will guide what we tell the district court at that point. Okay, well, thank you both for your assistance to us today. I have one final question for Miss Harrington. That is a concern to nobody else who is on the screen right now. What room are you in? That looks like a main justice room and one of those forgotten attorney generals in the background. Perhaps one that you've been in before. Judge Suffolk. This is the Civil Division main conference room. So I believe that's what that was. Yes, you are behind. You used to go to the A. G. S. Office, I suppose. Yes, exactly. Actually, your old stomping grounds. Well, I haven't stopped there in a while. Don't worry, Mr Wilson. I have no favoritism to decide here. Thank you, both. We are adjourned. Thank you.